520 A.2d 1129

**TOWN & COUNTRY MANAGEMENT CORPORATION**

v.

**COMCAST CABLEVISION OF MARYLAND.**

**No. 731, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Feb. 10, 1987.
Certiorari Denied June 18, 1987.

George A. Nilson (Lee Baylin and Piper & Marbury, on the brief), Baltimore, for appellant.

R. Bruce Beckner (Dow, Lohnes & Albertson, Washington, D.C., Michael A. Pace, Judith A. Mather and Dow, Lohnes & Albertson of Annapolis, on the brief), for appellee.

Argued before GILBERT, C.J., and ALPERT and POLLITT, JJ.

GILBERT, Chief Judge.

This appeal is concerned with cable television. Specifically, it asks whether the trial court erred in holding that certain television programing supplied by a particular company was not cable television. The principals in this case are Town & Country Management Corporation (Town), which manages a number of large apartment complexes in the metropolitan Baltimore area, and Comcast Cablevision of Maryland (Comcast), which, operating pursuant to a

nonexclusive franchise granted by Baltimore County, provides cable television service to subscribers in the county.[1]

In August 1980, the parties entered into contracts to provide cable television service to six of Town's complexes, one contract for each complex. By 1982, five additional contracts, similar to the first six, had been signed, extending the service to other complexes managed by Town. The contracts authorized Comcast to install and operate, in each of the apartment complexes, a "cable television antenna system" in order to provide "community television antenna service" to the tenants.

When Comcast first began "wiring" the county in 1980, it solicited apartment owners and managers, such as Town, for permission to supply the service to tenants. Town was agreeable to having the service but wanted some monetary consideration from the provider. As a matter of firm business policy, Comcast refused to pay any monies to Town. After some negotiation, the parties resolved the impasse through what may be regarded as a reciprocal "most favored nation" provision, which they inserted in each of the eleven contracts.

The first part of that provision, ¶ 9(a), states in essence that, if Comcast enters into any cable television service arrangement with any other apartment complex on terms more favorable to that apartment complex than are provided in the contract with Town, the Town contracts would be amended automatically to match the more favorable terms in the other contract. In short, if Comcast agreed to pay any other owner or manager of an apartment complex for the privilege of providing service to his tenants, it would have to pay Town on a similar basis.

The second part of the provision, ¶ 9(b), was intended to cover the converse situation of another cable television

---

1. Comcast Cablevision of Maryland is the successor in interest to Calvert Telecommunications Corporation, which was the contracting party in this case. For convenience, we shall use the name Comcast as including its predecessor.

service's offering better terms to Town. Paragraph 9(b) provides:

> "The Company [i.e., Comcast] further agrees that in the event any other *cable television service* offered in Baltimore County provides benefits, payments or other features to the parties referred to immediately above, the Company, at its option, shall immediately commence payments, benefits or provide other features to Owner on the same or nearly comparable basis as the *cable television service* offering the greatest payments, benefits, or other features, or shall terminate this Agreement." (Emphasis added.)

Subject to ¶ 9(b), the contracts afford Comcast the exclusive right to provide the cable television service to the complexes covered by them. Paragraph 10 of each contract states:

> "The rights of the Company to furnish to Owner's tenants *a cable television service* as contemplated hereunder shall be an exclusive right, and Owner will not, during the term of this Agreement, grant a competing right to any other person or undertake to provide such a service to any other *master television antenna system or cable television antenna service* unless the terms of Paragraph 9 set forth hereinabove are not strictly complied with. Notwithstanding anything herein to the contrary, Owner may continue to provide a master television antenna system to its tenants so long as Owner does not connect said master television antenna system to a *commercial cable television service*." (Emphasis added.)

Shortly after the first contracts between the parties were signed in 1980, Town learned that it would be some time before Comcast would be able to supply service to the Cockeysville area of the county, where Town managed a complex that was not covered by any of its contracts with Comcast. In September 1980, Town entered into a contract with Cable Garden, Inc. for the installation of a "Premium TV" service to the tenants of that complex. The "Premium TV" service was defined in that contract as follows:

"A 'Premium TV' service is three TV channels offering a group of programs not available on current commercial TV. This program group will include the following or equivalent: Warner Amex's Movie Channel, featuring new and recently released movies, as well as ESPN's Sports Channel and a third channel, Ted Turners Cable News Network (CNN) to be activated within one year after completing construction of the system."

Unlike Comcast, Cable Garden, Inc. agreed to pay a commission to Town based on the rate of tenant subscription to its service. Paragraph 21 of its contract stated:

"Cable Garden agrees to pay a monthly commission per subscriber to The Town and Country Management Corporation to be paid quarterly, based on the percentage of subscribers to the total number of rented apartments at the Complex serviced by this agreement at the following rate:

| | |
|---|---|
| 0% to 25% | $ .25 |
| 26% to 35% | .50 |
| 36% to 55% | 1.00 |
| Above 55% | 2.00" |

Cable Garden, Inc. was apparently slow in installing its system and never attracted a large number of subscribers. It made no payments under its contract until 1983, and even then the payments were not very large. Nonetheless, Town regarded the payments made by Cable Garden, Inc. as triggering ¶ 9(b) in its contracts with Comcast and thus demanded that Comcast begin making payments consistent with the Cable Garden, Inc. formula, which it refused to do. Town became even more insistent in 1985, when it received two additional proposals to replace the current Cable Garden, Inc. service—one from Cable Garden, Inc. and one from BBC Satellite.

The new Cable Garden, Inc. proposal was for "SMATV" [2] service in two tiers. The "local tier" would consist of eight

---

2. "SMATV" means Satellite Master Antenna Television.

Baltimore-Washington commercial channels [3] and one local public television channel.[4] The "premium tier" was to include seven satellite channels, including a news channel (CNN), a sports channel (ESPN), a "music" channel (MTV), a children's channel (Nickelodian), a movie channel (TMC), and two general feature channels (USA and WGN). Under the terms of the proposal, Cable Garden, Inc. was to pay an even higher commission to Town, ranging from $1 per month per subscriber to $2.75 per month when over 55 percent of the tenants subscribed.

The BBC system is also described as a "SMATV" system. It proposed "one premium movie channel, one satellite sports or news network, one satellite superstation and three Baltimore or Washington over-the-air channels." The BBC proposal would have paid a commission to Town of 5 percent of "gross subscriber receipts."

Because of Comcast's continuing intransigence, based on its assertion that the services being rendered by Cable Garden, Inc., as well as those proposed by that company, and by BBC Satellite were not "cable television service" for the purposes of ¶ 9(b), Town filed this action in the Circuit Court for Baltimore County. The suit, seeking both damages and declaratory relief, charged Comcast with breach of contract. Town asked for a declaratory judgment that Cable Garden's and BBC's proposed services did constitute "cable television service" under ¶ 9(b), and that Comcast was required either "to commence payments on the same basis as those offered by Cable Garden (or similar cable television services) or terminate the agreements...." Alternatively, Town asked for a declaratory judgment that the services offered and proposed by Cable Garden, Inc. were *not* the types of services contemplated under ¶ 10 of the contracts, and that Town was at liberty to install that

---

**3.** Channels 2, 4, 5, 7, 9, 11, 13, and 45.

**4.** Channel 67.

service in the eleven complexes already covered by the contracts with Comcast.

Throughout the nonjury trial in the circuit court, Comcast maintained that the term "cable television service," as used in ¶ 9(b), meant only a cable television service that was franchised by Baltimore County. The trial judge rejected that interpretation. Comcast has not pursued that matter in this appeal. During the course of the trial, when Town first offered parol evidence as to its intentions with respect to ¶ 9, the court concluded that the term was ambiguous and, therefore, permitted both parties to offer parol evidence on the issue.

The evidence elicited concerned primarily perceptions of how SMATV was regarded in the cable television industry. O.D. Page, testifying for Town, had been working in the cable television industry since 1968. He related to the court:

"In common usage in the industry a cable system is a system that sells a television service to subscribers and generally carries something more than just over the air broadcasting and such satellite channels, and may I go further, almost all satellite channels are classified as cable service by the buyer of those services."

Mr. Page made clear that, while SMATV did not offer the full range of channels carried by franchised cable companies, the two types of companies were, nevertheless, in competition. SMATV operators, he said, attempted to convince prospective subscribers that the extra channels carried by franchised companies were of little benefit.

Archer S. Taylor, a witness on behalf of Comcast, had a different view. He opined:

"Cable television as I see it is a service offered by cable television systems. Cable television systems are managed, operated by cable television operators, but I see the cable television systems as community-wide systems with wires distributed throughout the community subject to a lot of local regulation and federal regulation, to

payment of franchise fees, and general regulatory—specific regulatory requirements imposed by both the federal government and the local franchising authorities."

A "satellite master antenna or satellite reception service," he said, is "not a cable television service."

The trial judge resolved the dispute in favor of Comcast, concluding that the service offered or proposed by Cable Garden, Inc. did not constitute a "cable television service" within the meaning of ¶ 9(b). The court stressed two factors in reaching that conclusion: (1) appellant's counsel had drafted the final version of the contracts, and that any ambiguity should, therefore, be construed against appellant; and (2) both experts recognized a distinction between "a cable system and a satellite system." As to the latter, the court commented:

"One thing that you can put your finger on and it may not be conclusive, but certainly it is in support of the Court on its conclusion is that the uncontradicted testimony is that you cannot receive the same programs, the same channels on the satellite system as you can on the cable system. So if you can't get the same programs, it seems to me to follow necessarily that there is a difference between the two systems and so I think that common sense comes down on the same side as the common usage as testified to by the experts."

Upon that premise, the court ruled that Comcast was not required to make payments to Town under ¶ 9(b), but Town was entitled, under ¶ 10, to permit SMATV service in complexes covered by its contracts with Comcast. A declaratory judgment embodying those rulings was entered, and both sides appealed.

Town complains about the court's construction of the critical term of ¶ 9(b), "cable television service." Town argues that the term unambiguously includes the kind of service provided or offered by Cable Garden, Inc. or BBC; or, even if the term is ambiguous, the *evidence* requires that conclusion. Comcast, as cross-appellant, complains

about the declaratory judgment as to ¶ 10. It argues that the controversy as to exclusivity was not ripe for adjudication, and the evidence does not support the court's conclusion.

Language can be regarded as ambiguous in two different respects: (1) it may be intrinsically unclear, in the sense that a person reading it without the benefit of some extrinsic knowledge simply cannot determine what it means; or (2) its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain. *See Tucker v. Fireman's Fund Insurance Co.*, 308 Md. 69, 517 A.2d 730 (1986): "That a term may be free from ambiguity when used in one context but of doubtful application in another context is well settled."

The problem before us is of that second variety because there is nothing inherently confusing about the term "cable television service [or system]." It has been defined in regulations of the Federal Communications Commission since 1972;[5] it has been defined in various statutes;[6] it is

---

**5.** *See* Telecommunications, 47 C.F.R. § 76.5(a), which, prior to 1985, defined "cable television system" as
> "[a] non-broadcast facility consisting of a set of transmission paths and associated signal generation, reception, and control equipment, under common ownership and control, that distributes or is designed to distribute to subscribers the signals of one or more television broadcast stations, but such term shall not include (1) any such facility that serves fewer than 50 subscribers, or (2) any such facility that serves or will serve only subscribers in one or more multiple unit dwellings under common ownership, control, or management."

In 1985, that section was revised to define a "cable system or cable television system" as
> "[a] facility consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include (1) a facility that serves only to retransmit the television signals of one or more television broadcast stations; (2) a facility that serves only subscribers in one or more multiple unit dwellings under common ownership, control or unit dwellings under common ownership, control or management, unless such facility or facilities uses any public right-o[f]-way; (3) a

**6.** See note 6 on page 281.

used at least twice in the Annotated Code of Maryland;[7] and the parties presumably had some understanding of what it meant when they signed the contracts. The question is a more particular one of whether, as used in the contracts at issue, the term was intended to encompass the kind of SMATV service offered or provided by Cable Garden, Inc. or BBC.

There are many rules for construing contracts, the overriding one being to determine and carry out the intention of the parties, if possible. Unfortunately, where the parties are in such disagreement as to necessitate litigation, evidence as to intent is not only often in conflict, but it takes on a distinctly *ex post facto* patina. Perhaps that is why courts look first at the contract itself. If the language of the contract is sufficiently clear, the parties will be presumed to have meant what they said and said what they meant, irrespective of whether, in fact, they did. In that event, "the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *General Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985).

When engaging in that analysis, the court must read all relevant parts of the contract as a whole and construe them,

---

facility of a common carrier which is subject, in whole or in part, to the provisions of Title II of the Communications Act of 1934, as amended, except that such facility shall be considered a cable system to the extent such facility is used in the transmission of video programming directly to subscribers; or (4) any facilities of any electric utility used solely for operating its electric utility systems."

**6.** *See, for example,* N.Y.Penal Law ¶ 155.00(9) (consol.) *defining the term as meaning* "any and all services provided by or through the facilities of any cable television system or closed circuit coaxial cable communications system, or any microwave or similar transmission service used in connection with any cable television system or other similar closed circuit coaxial cable communications system."

**7.** *See* Md.Code Ann. art. 23A, § 2(13); art. 27, § 194B.

if possible, in harmony. It is only when the parties' intention, either real or presumed, cannot be ascertained from the contract itself that extrinsic evidence may be considered.

On that basis we examine the contracts and consider the status of the parties to see if the trial court correctly determined either their intent or the intent of reasonable persons in their position.

The purported ambiguity arises from the differences between a franchised cable system, such as Comcast offers, and a SMATV system, as offered or proposed by Cable Garden, Inc. and BBC. A good synopsis of the two systems is provided in *N.Y. State Com'n on Cable Television v. F.C.C.*, 749 F.2d 804, 806 (D.C.Cir.1984):

> "The rapidly expanding cable industry has spawned a variety of methods by which cable viewing can be distributed to the public. 'Traditional' or 'franchise' cable systems use large remote antennas to capture television signals. The signals are distributed from the large antennas to viewers through coaxial cable laid under city streets or along telephone lines. Within the past decade, marketing innovations and advances in satellite and microwave technology have eliminated the need for the use of public rights-of-way to distribute 'cable' viewing to some subscribers. Large apartment buildings and hotels can install a master antenna television (MATV) system which captures a television broadcast signal off the air and delivers it to tenants through coaxial cables that run through the buildings. In addition to improving normal television reception, MATV enables tenants to take advantage of the cable system involved in this litigation, satellite master antenna television (SMATV). SMATV transmits television signals from satellites directly to satellite receiving stations ('receive-only earth stations') atop multi-unit dwellings. The signal is converted to a

usable frequency and distributed to subscribing tenants through the existing MATV system." [8]

That the two systems are different in their technologies is by no means dispositive of the issue, because there are also a number of similarities. Both systems are subject to preemptive regulation by the Federal Communications Commission, the authority of local government being limited to "reasonable regulations regarding use of the streets and rights-of-way." *Duplicative and Excessive Over-Regulation of Cable Television*, 54 F.C.C.2d 855, 861 (1975).[9] Both systems may involve the use of public streets and rights-of-way and thus fall under some local control.[10] Both systems

---

**8.** As the court also observed, there are at least two other systems, or variations, that have been developed, but which are not involved in this case—MDS (multi-point distribution service) and DBS (direct broadcast satellite). The Court described those systems:

> "A similar system, multi-point distribution service (MDS), beams microwave signals terrestrially to special antennas atop the buildings, and, like SMATV, uses the MATV system to distribute the signals to individual tenants. In the near future, satellite signals will be available to those who do not reside in large apartment dwellings. Direct broadcast satellite (DBS), potentially the most significant of the recent technological innovations, will provide direct satellite communication to individual homes, taking advantage of high-powered satellites and small, efficient earth receiving stations."

749 F.2d at 806.

**9.** An extensive treatment of FCC regulation of the cable television industry, including SMATV, appears in C. Ferris, F. Lloyd, and T. Casey, *Cable Television Law* (1986). For a briefer synopsis, see *N.Y. State Com'm on Cable Television v. F.C.C., supra*, 749 F.2d 804. *See also In re Orth–O–Vision, Inc.*, 69 F.C.C.2d 657 (1978), *recon.* 82 F.C.C.2d 178 (1980), *aff'd sub nom N.Y. State Com'n on Cable T.V. v. F.C.C.*, 669 F.2d 58 (2d Cir.1982).

**10.** As pointed out in 2 *Cable Television Law, supra*, § 21.06, SMATV may or may not require a local franchise:

> "Although SMATV is a relatively inexpensive means of video distribution, many believe that the key to SMATV profit-maximization is the interconnection of multiple unit dwellings served by a single satellite dish. Interconnection allows economies of scale and it also expands the pool of potential subscribers.
>
> Interconnection can be accomplished either by cable or by microwave. SMATV interconnection by cable is unattractive because if the cable traverses public rights of way a local franchise will often be held necessary. This generally entails a lengthy franchising

possess essentially the same objective: making available to home viewers, for a subscription fee, television programs not available on broadcast channels as well as a clearer reception of broadcast television programs. Most importantly, since both systems share that common objective and provide a generally similar, if not identical, service, they are *ipso facto* competitors, especially with respect to large apartment complexes.[11]

The similarities between the two systems, more than the differences, have received statutory attention. Md.Ann. Code art. 23A, § 2(b)(13), art. 25, § 3C(b) authorizes incorporated municipalities "to grant one or more exclusive or nonexclusive franchises for a community antenna system *or other cable television system* that utilizes any public right-of-way, highway, street, road, lane, alley, or bridge...." (Emphasis added.) The use of the word "other" in that statute suggests a reasonably clear legislative intent to

---

process and payment of a franchise fee to the local authorities. In many areas exclusive cable franchises have already been granted, and cable interconnection would not even be possible. This leaves microwave interconnection as the only feasible alternative." (Footnotes omitted.)

11. In 2 *Cable Television Law, supra,* §§ 21.01 and 21.02, it is said:
    "Two developments of recent years have combined to expand SMATV use. The first of these was the advent in the mid–1970's of satellite delivery of cable programming, particularly movie services. The second was the FCC's deregulation of satellite earth station ownership in 1979. This action, together with the rapid decline in the cost of satellite antennas, made SMATV economically feasible for a far wider universe of dwelling complexes.
    SMATV is a relatively inexpensive video delivery system. The cost of installing a SMATV system is much lower, per unit, the larger the complex to be served. For systems serving small apartment buildings (fewer than 200 units) SMATV may not be economically feasible unless more than one building can be interconnected. Interconnection also introduces significant economies of scale to larger systems." (§ 21.01; footnotes omitted.)
    "SMATV is a widespread and growing video service. Some estimates indicate that there are already as many as 500,000 SMATV subscribers nationwide. The additional potential market is also large." (§ 21.02; footnote omitted.)

regard a community antenna system, which is the heart of a SMATV system, as a "cable television system."

An even stronger statement with respect to legislative intent is found in Md.Ann.Code art. 27, § 194B. That section prohibits persons from tampering with the equipment "of a franchised cable television company or private cable television company with the intent to obtain cable television services without payment." SMATV is regarded as a "private cable" system. *See* 2 *Cable Television Law, supra,* § 21.01. It is readily apparent that the Legislature has given explicit recognition to the fact that private cable companies do provide "cable television services." *See People v. Frankel,* 129 Misc.2d 95, 492 N.Y.S.2d 671 (N.Y.City Crim.Ct.1985), construing "cable television service," as used in a counterpart anti-theft statute, to embrace both cable and microwave transmission.

Previous counsel for Town, who, as noted, drafted the final version of the contracts at issue, disclaimed much knowledge about the nuances of the cable television industry. Notwithstanding that disclaimer, it is clear from the evidence that the contracting parties had more than a superficial understanding of what MATV and SMATV were and how they differed from the operation run by Comcast. Town already had MATV systems in place for the benefit of its tenants at the time it contracted with Comcast. The installation of Comcast's system, according to ¶ 1 of the contracts, did not involve that existing system; rather, it required running wires from outside utility poles to the exterior of the apartment building and then attaching connections from those wires into the dwelling units of the subscribing tenants. Nevertheless, the potential for using the existing MATV system to provide "cable television service" was expressly recognized. As previously observed, ¶ 10 of the contract permits Town to continue its MATC system "so long as [it] does not connect said master antenna system to a commercial cable television service."

What kind of "commercial cable television service" could be connected to Town's MATV? From both the elementary literature on the subject,[12] and from the testimony, it would certainly include SMATV. Indeed, that was the basis of the Cable Garden, Inc. system contracted for just a month after the first six contracts with Comcast were signed and well before the other five were signed.

From the known state of the industry, and from the contracts themselves, it is evident that the parties must have recognized: (1) SMATV was, or soon would become, available; (2) large apartment complexes were prime targets for SMATV companies; and (3) the services offered by SMATV, though not as complete and extensive as those offered by Comcast, were similar in nature and, to some extent, the same. Reasonable persons in the position of the contracting parties would have recognized those things. In that light, the "most favored nation" provisions in ¶ 9 and the related exclusivity provisions in ¶ 10 must be read with the threat or the benefit of competition from SMATV in mind. Given the unlikelihood of another cable company being franchised in Baltimore County, as testified to by Comcast's then-President, Dr. Berger, the *only* prospective competition that would arise was likely to emerge from SMATV.

Even if in another context the term "cable television services" might be regarded as ambiguous, on the record before us it is crystalline that the term, as used in ¶¶ 9 and 10 of the contracts at issue, was intended to include, and

---

12. In 2 *Cable Television Law, supra,* § 21.01, it is noted:
    "The basis for SMATV operation is a master antenna system (MATV). Most large apartment complexes have been equipped with MATVs for many years. These systems receive and amplify television broadcast signals and distribute them to individual apartments via the building's 'private cable' system. When satellite receiving equipment is added to the system it can pick up cable networks, superstations and pay-television services carried by communications satellites, thus greatly expanding the viewing options of apartment dwellers."
    (Footnote omitted.)

does embrace, SMATV. We, therefore, vacate the contrary judgments entered by the circuit court and remand the matter for such further proceedings as may be necessary in order to adjudicate Town's claim for damages and for the entering of appropriate judgments in conformance with this opinion.

JUDGMENTS VACATED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS.

COSTS TO BE PAID BY APPELLEE.