575 A.2d 795

Robert A. BENTZ et ux.

v.

MUTUAL FIRE, MARINE & INLAND INSURANCE COMPANY, et al.

No. 1664, Sept. Term, 1989.

Court of Special Appeals of Maryland.

June 29, 1990.

Robert J. Lynott (Kevin P. Benbrook and Moore, Libowitz & Thomas on the brief), Baltimore, for appellants.

Robert B. Kershaw (John T. Ward and Quinn, Ward and Kershaw, P.A. on the brief), Baltimore, for appellee Mut. Fire Marine & Inland Ins. Co.

Stanley L. Lipshultz (Victor L. Weiner and Lipshultz and Hone, Chartered on the brief), Silver Spring, for appellee Wright–Gardner.

Argued before WILNER, BISHOP and KARWACKI, JJ.

WILNER, Judge.

We have before us a declaratory judgment action raising an issue of insurance coverage. Those kinds of actions, unfortunately, are not rare. This *is* an uncommon action, however, in terms of both the issue involved and the manner in which it comes to us.

### Background

The plaintiffs are Robert and Elizabeth Bentz. On June 18, 1982, they purchased a home in Falling Water, West Virginia and shortly thereafter moved all of their possessions into it and began to live there. Before moving in, they engaged Wayne J. French, a pesticide applicator licensed in Maryland and West Virginia and trading as French's Termite & Pest Control, to treat their new home.

They allege that on June 17, 1982 and again on April 6, 1983, Mr. French's son, Ricky French, acting as an agent of his father or the company, "negligently, carelessly and recklessly made an application of toxic pesticide chemicals to the Premises." Specifically, they contend that these toxic chemicals "were openly sprayed upon interior environmental surfaces and openly applied to exterior portions of the Premises" and that "[s]uch manner of application" violated Federal, Maryland, and West Virginia laws, permanently destroyed "the Premises as suitable for use as a residential dwelling," destroyed the personal property located therein, and exposed the occupants to serious health hazard.

The Bentzes allege further that (1) both Maryland and West Virginia law requires all licensed pesticide applicators to maintain liability insurance for injury and damage arising from the use or misuse of pesticides and that no applicator's license may issue unless a certificate of insurance is filed with the State Department of Agriculture, the licensing agency; (2) in 1981, French [1] applied to Wright–Gardner Insurance, Inc. (Wright–Gardner), an insurance agency located and licensed in Maryland, for a policy that would comply with Maryland and West Virginia law; and (3) Wright–Gardner procured for French a policy from Mutual Fire, Marine & Inland Insurance Company (Mutual Fire) and certified the issuance of that policy to the State Department of Agriculture.

The nub of the Bentzes' complaint is in the final four averments—that they sued French in the Circuit Court for Washington County to recover for their personal injuries and property damage, that Mutual Fire denied that its policy covered the claim and refused to defend French, that French has a meritorious cause of action against either Mutual Fire to declare and enforce his rights under the

---

1. For convenience, unless otherwise noted, we shall refer to Wayne French, Ricky French, and the apparently unincorporated company collectively as "French."

policy or against Wright–Gardner for breach of contract and negligence in failing to procure a proper policy, and that French

"has co-extensively assigned to Plaintiffs all of his rights, interests, and causes of action to proceed against [Mutual Fire and Wright–Gardner] to obtain a judicial Declaration of [their] duties and liabilities ... pursuant to the said policy of insurance or the application, issuance, and/or sale thereof and has authorized Plaintiffs to institute this declaratory judgment action against Defendants to obtain a judicial Declaration of rights, duties, and liabilities aforesaid."

Upon these averments, the Bentzes did indeed sue Mutual Fire and Wright–Gardner in the Circuit Court for Washington County seeking (1) in Count I, a declaratory judgment that French is an insured under the policy with respect to the claim made by the Bentzes and that Mutual Fire is obligated to defend the claim and pay any judgment rendered against French, and (2) in Counts II and III, a declaratory judgment that Wright–Gardner breached its contract with French to procure a policy that would cover the Bentzes' claim, that it is liable to French and the Bentzes for any judgment obtained by the Bentzes, and that it is obligated to defend French against the claim made by the Bentzes.[2]

Both defendants moved to dismiss the complaint on the grounds that the Bentzes lacked the legal capacity to bring the action, that they failed to join a necessary party (French), and that the complaint failed to set forth a justiciable controversy. In a Memorandum entered October 15, 1985, the court held that (1) by reason of the assignment from French, the Bentzes were entitled to bring the action against both defendants and that French was not a neces-

---

**2.** Count II is based on a breach of contract theory; Count III, though seeking exactly the same declaratory relief, is grounded on the alleged negligence of Wright–Gardner in failing to procure a proper policy. No damages are sought in either count.

sary party, (2) there was no coverage under the Mutual Fire policy and thus no justiciable controversy as to that company, (3) a justiciable controversy *was* stated under Count II with respect to Wright–Gardner, and (4) as Count III was duplicative of Count II, it should be dismissed. An accompanying order dismissed Counts I and III without leave to amend. No declaratory judgment of any kind was entered. Following the failure of a motion for reconsideration filed by the Bentzes, they voluntarily dismissed Count II—the only one left alive—and brought this appeal.

## *The Issues*

The appellees have apparently acquiesced in the court's determination that, by reason of the assignment from French, the Bentzes have the capacity and authority to maintain this action against them. That has not been raised as an issue in this appeal, and we therefore do not address it.

The Bentzes contend that the policy language in question is ambiguous and that, properly construed, it provides coverage. They also urge, as an alternative, that they stated a good cause of action against Wright–Gardner based on negligence and that the court erred in dismissing it. Wright–Gardner, for obvious reasons, supports the Bentzes in their claim against Mutual Fire, but on different grounds than those pressed by the Bentzes.

The policy is one of Manufacturers' and Contractors' Liability Insurance. In the "coverage" section, Mutual Fire agreed to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage "to which this insurance applies, caused by an *occurrence* ...." (Emphasis added.) The term "occurrence" is defined in the policy as meaning "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Mutual Fire's position is grounded on a "Pollution and Contamination Exclusion," which states, in relevant part: "This policy shall not apply to personal injury or property damage arising out of the discharge, dispersal, release or escape of: (1) [s]moke vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental . . . ."* (Emphasis added.)

The insurer contends that the Bentzes' claim arises from the intentional discharge of a toxic chemical by French in the course of his treatment of the home, that the discharge was neither sudden nor accidental, and that the exclusion rather than the exception to it applies. The Bentzes, reading the exception in light of the definition of "occurrence," contend that the discharge was both sudden and accidental and that the exception therefore *does* apply. Wright–Gardner takes a broader view of the matter. Though acknowledging that a number of courts have engaged in the exercise of deciding whether a particular discharge is "sudden" or "accidental," it urges that the exclusion was never intended to apply to situations such as this. In a nutshell, its position is that "the pollution exclusion applies [only] to active polluters and not to insureds who apply pesticides to individual homes."

### Discussion

As a preliminary matter, we note that, even though convinced that no coverage was afforded under the policy, the court should not have dismissed Count I but should, instead, have entered a declaratory judgment articulating and implementing its construction of the policy. See *Mauzy v. Hornbeck,* 285 Md. 84, 400 A.2d 1091 (1979) and cases cited therein.

Whether there is coverage under the Mutual Fire policy, at least with respect to an obligation of the insurer to

defend, depends on two things: the relevant provisions of the policy and the averments of the Bentzes' action against French.

■■■■ With respect to the policy, Maryland follows the rule that "[i]nsurance policies, being contractual, are construed as other contracts." *Bond v. Pennsylvania Nat'l Mut.*, 289 Md. 379, 384, 424 A.2d 765 (1981). Words are given their customary and normal meaning. Although this State has not subscribed to any special rule construing policies most strongly against the insurer, if there is an ambiguity in the policy it is usually construed against the insurer because, in most instances, the insurer drafted the policy, and, under normal contract law, the draftsman takes the consequences of the ambiguity he drafted. *See National Grange Mut. Ins. v. Pinkney*, 284 Md. 694, 705, 399 A.2d 877 (1979).

Unfortunately, the complaint filed against French does not appear to be in the record and is certainly not in the record extract. Our knowledge of the underlying claim for which coverage is sought comes only from the allegations in the declaratory judgment complaint, namely, that the pesticide chemicals were "openly sprayed upon interior environmental surfaces and openly applied to exterior portions of the Premises," that such manner of application was negligent, careless, reckless, and in violation of State and Federal law, and that it damaged or destroyed the real and personal property and caused injury to the occupants of the home.

Although we would have preferred to have the underlying complaint before us, these characterizations of it do at least reveal three important things, directly or inferentially: (1) that the damage was apparently limited to the Bentzes property; (2) that it arose from the very kind of operation— the application of pesticide to a customer's property pursuant to a contract with that customer—that a Manufacturers' and Contractors' liability policy is intended to cover; and (3) although the actual application of the pesticide was

intentional, the harm was not intentional but arose from the "fact" that the pesticide was applied in a negligent or reckless manner.

We are informed that the pollution exclusion clause was introduced as an endorsement in 1970 and began to be included as part of the standard Comprehensive General Liability Policy in 1973. *See* 2 R. Long, *The Law of Liability Insurance*, § 11.09[5] (1990). *See also* Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 Geo.L.J. 1237 (1986), tracing in greater detail the history of coverage for pollution claims from "accident" based policies through "occurrence" based policies and the efforts to limit coverage through specific exclusions. The Maryland Insurance Commissioner did not permit a pollution exclusion clause until 1983.[3]

There appear to have been two basic versions of the early exclusion clause—the Standard ISO (Insurance Services Office) clause, which is the one found in the Mutual Fire policy, and the "Travelers" clause, which tracks more the language of the definition of "occurrence" and applies the exclusion where the discharge "is either expected or intended from the standpoint of any insured." *See* B. Ostrager and T. Newman, *Handbook on Insurance Coverage Disputes* § 8.02[b] (1989). The "Travelers" clause says nothing about "sudden and accidental" discharges. *Id.* We mention this difference because both clauses have been the subject of judicial construction, and it is important, when considering the holdings of the courts and the language used by them, to keep in mind what it was they were

---

**3.** The first application to the Maryland Insurance Commissioner for approval of a pollution exclusion clause came in October, 1981. Approval was not given until January, 1983, however. Mutual Fire was not an "admitted" insurer subject to the full jurisdiction of the Insurance Commissioner but was instead a "surplus lines" insurer authorized to write policies under Md.Ann. Code art. 48A, §§ 183–199. Had the policy issued to French in 1982 been written by an "admitted" insurer, it could not have contained the pollution exclusion clause.

construing. It is the construction of the ISO clause that is most pertinent to us.[4]

The pollution exclusion clause, together with the exception contained in it, can cover a wide variety of circumstances—contamination of land and structures on which the substance is stored, seepage or dispersal of substances onto neighboring property or into wells, aquifers, or sewerage systems, actual dumping of hazardous substances, the escape of gases into the air from the site of storage or use, the unintended dispersal of substances through otherwise lawful spraying operations. Each of these circumstances, and others not mentioned, has its own set of sub-circumstances, in terms of whether the discharge was deliberate, careless, or entirely innocent, whether it was foreseeable or unforeseeable, and how, why, and over what period of time it occurred. This too must be taken into account in considering how the clause is to be interpreted and applied.

Most of the cases involving the ISO clause have centered on whether the discharge at issue was sudden and accidental. That, we presume, is because unless the discharge fell within that category, the claim would likely fall within the exclusion and not be covered. Two basic approaches have emerged. Some courts have looked only to the exclusionary clause, found the words "sudden and accidental" to be unambiguous, and have given them their ordinary meaning. Where the discharge continued for any appreciable period of time, therefore, or was deliberate or foreseeable, it was not regarded as sudden and accidental and the claim arising

---

4. As a result of the extensive (and often restrictive) judicial construction, a number of changes in or alternatives to the standard exclusion have developed. The clause itself was substantially modified in 1985, among other things to eliminate the exception for sudden and accidental discharges. 2 R. Long, *supra,* § 11.09[5]; B. Ostrager and T. Newman, *supra,* § 8.02[e]. It appears also, however, that special endorsements are now available for additional premiums, including a clause for pesticide applicators not only retaining the "sudden and accidental" exception but excepting as well claims arising from operations "conducted away from premises owned by or rented to the *named insured*" if the operation meets applicable legal requirements. 2 R. Long, *supra,* § 10A.03.

from it was not covered. *See, for example, U.S. Fidelity and Guar. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988); *Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.,* 702 F.Supp. 1317 (E.D.Mich.1988); *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987); also cases cited in those cases and in B. Ostrager and T. Newman, *supra,* § 8.02[c]. That, of course, is the position urged by Mutual Fire. They note not only that the underlying complaint by the Bentzes fails to allege specifically that the discharge was sudden and accidental (something we are unable to verify) but that it could not under the circumstances *be* sudden and accidental. The discharge itself was deliberate, they urge, and apparently continued throughout the time French was engaged in treating the premises.

Other courts have found the terms ambiguous on a variety of grounds. Some compare the "sudden and accidental" exception to the definition of "occurrence," which, in nearly all policies issued after 1966, measures the extent of general coverage and includes the continuous or repeated exposure to conditions resulting in injury or damage "neither expected nor intended from the standpoint of the insured." The New Jersey courts, for example, have "consistently interpreted that exclusion to constitute the equivalent of an occurrence and to eliminate coverage only where such damages appear to be expected or intended on the part of the insured." *Summit Assoc. v. Liberty Mut. Fire Ins.,* 229 N.J.Super. 56, 550 A.2d 1235, 1239 (1988). See also cases cited in B. Ostrager and T. Newman, *supra,* § 8.02[d][1] and in *U.S. Fid. & Guar. v. Specialty Coatings,* 180 Ill. App.3d 378, 129 Ill.Dec. 306, 535 N.E.2d 1071, 1076–77, *cert. denied* 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989).

Some courts have extended this analysis to create, in effect, a double limitation on the exclusion—not only are "sudden" and "accidental" looked at in terms of what was intended by the insured but the intended or unintended event, according to these courts, is the *damage,* not the

discharge that caused the damage. See *Allstate Ins. Co. v. Klock Oil Co.*, 73 A.D.2d 486, 426 N.Y.S.2d 603, 605 (1980):

> "The term [accidental] is to be given its ordinary and popular meaning in the business liability insurance area.... If there was no intent to cause harm then any injury resulting from ordinary negligence is considered to be accidental. The 'accident' is simply the undesigned event and the natural and ordinary consequences of a negligent act are not precluded [from coverage]."

(Citations omitted.) The same conclusion was expressed in *Jackson Tp., Etc. v. Hartford Acc. & Indem.*, 186 N.J.Super. 156, 451 A.2d 990, 994 (1982):

> "When viewed in light of the case law cited, the clause can be interpreted as simply a restatement of the definition of 'occurrence'—that is, that the policy will cover claims where the injury was 'neither expected nor intended.' It is a reaffirmation of the principle that coverage will not be provided for intended results of intentional acts but will be provided for the unintended results of an intentional act."

*See also Reliance Ins. Co. of Illinois v. Martin*, 126 Ill. App.3d 94, 81 Ill.Dec. 587, 467 N.E.2d 287 (1984); *U.S. Fid. & Guar. v. Specialty Coatings, supra*, 136 Ill.Dec. 609, 545 N.E.2d 133; *Shapiro v. Public Service Mut. Ins. Co.*, 19 Mass.App. 648, 477 N.E.2d 146 (1985), *rev. denied* 395 Mass. 1102, 480 N.E.2d 24, *rev. denied* 395 Mass. 1105, 482 N.E.2d 328 (1985); *Farm Family Mut. Ins. Co. v. Bagley*, 64 A.D.2d 1014, 409 N.Y.S.2d 294 (1978).

In *Niagara Cty. v. Utica Mut. Ins. Co.*, 103 Misc.2d 814, 427 N.Y.S.2d 171 (1980), the New York Court introduced what some have regarded as a separate theory upon which to constrict the exclusion, that it is limited to "active" polluters. That notion, which is the one principally espoused by Wright–Gardner in this case, has been mentioned a number of times by the New York courts. See, for example, *Niagara County v. Utica Mut. Ins. Co.*, 80 A.D.2d 415, 439 N.Y.S.2d 538, 540 (1981), holding that the exclusion was intended to apply only to "actual polluters";

and *Autotronic Systems, Inc. v. Aetna Life & Cas.,* 89 A.D.2d 401, 456 N.Y.S.2d 504 (1982), following *Niagara County, supra,* and holding, 456 N.Y.S.2d at 505–06:

> "The clear purpose of the statutorily required exclusion is to strengthen New York's environmental protection standards by imposing the full risk of loss due to personal injury or property damage from pollution upon the commercial or industrial enterprise that does the polluting and by eliminating the enterprise's option of spreading that risk through insurance coverage.... This purpose would not be served by applying the exclusion to insureds who are not engaged in the industrial or commercial activity that produce the pollution, although their acts of commission or omission may have resulted in bodily injury or property damage arising out of pollution."

(Citations omitted.)

We shall decline Wright–Gardner's invitation to apply that broad theory in this case. For one thing, the underpinning of the theory, as made clear in *Autotronic,* is a New York statute (N.Y.Ins.Law, § 46, subds. 13, 14), for which there appears to be no counterpart in Maryland. For another, the circumstances in which it has been applied by the New York courts are quite different from those before us. The *Niagara* cases grew out of the Love Canal litigation; Niagara County was sued, not as an active creator or dumper of hazardous wastes but for negligence in failing to prevent others from dumping wastes on county property, in failing to warn neighboring landowners, in failing to enforce health regulations, and in selling adjacent property without warning of the hazards. The issue was whether the county's insurer was obliged to defend against those allegations. *Autotronic* involved an action by an employee of a self-service gasoline station against the designer and installer of the station for injuries resulting from exposure to toxic substances in the leaded gasoline sold at the station. Recalling the statutory purpose for the exclusion, the Court held that the defendant's role "was not such that it should be precluded, by application of the statutory exclu-

sion, from spreading its risk of loss through liability insurance." *Autotronic Systems, Inc. v. Aetna Life & Cas., supra,* 456 N.Y.S.2d at 506. In contrast, French is being sued for actively polluting the Bentzes' home, not for merely passive conduct. Finally, we note that, not only has this theory not been generally applied outside of New York, but it has been rejected by at least one court *in* New York. *See Powers Chemco, Inc. v. Federal Ins. Co.,* 144 A.D.2d 445, 533 N.Y.S.2d 1010 (1988); *see also Fireman's Fund Ins. Companies v. Ex–Cell–O Corp., supra,* 702 F.Supp. 1317, 1325 n. 12. *Compare United Pacific Ins. v. Van's Westlake Union,* 34 Wash.App. 708, 664 P.2d 1262 (1983).

This leaves us, then, to determine whether the discharge complained of by the Bentzes was "sudden and accidental," and, in that context, to determine what those terms mean.

In *Town & Country v. Comcast Cablevision,* 70 Md.App. 272, 280, 520 A.2d 1129, *cert. denied* 310 Md. 2, 526 A.2d 954 (1987), we observed:

> "Language can be regarded as ambiguous in two different respects: (1) it may be intrinsically unclear, in the sense that a person reading it without the benefit of some extrinsic knowledge simply cannot determine what it means; or (2) its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain. *See Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69, 517 A.2d 730 (1986): 'That a term may be free from ambiguity when used in one context but of doubtful application in another context is well settled.'"

There is nothing intrinsically unclear about the terms "sudden" and "accidental." They are well-defined in the standard dictionaries. And when given their common meaning, they do not necessarily conflict with the definition of "occurrence," as some courts have concluded. In this regard, we agree with the analysis in *American Motorists Ins. Co. v. General Host Corp., supra,* 667 F.Supp. 1423, 1429:

> "The contract is clear: 'occurrences,' as defined, are covered *unless* the occurrences arise out of pollution events; those are not covered *unless* such pollution events are sudden and accidental. Read as a whole, the policy covers 'continued and repeated exposures' except for exposures to pollution; then it covers only 'sudden and accidental' events."

We do not believe, therefore, that "sudden and accidental" is co-extensive with "occurrence" to the point that the exclusion is swallowed by the exception to it. Nor, therefore, do we align ourselves with those courts that construe the exclusion in terms of whether the injury, as opposed to the discharge, was accidental and sudden. That construction necessarily comes from the definition of "occurrence," which indeed speaks of whether the *injury or damage* is expected or intended by the insured, rather than from the exclusion clause, the exception to which applies only when "*such discharge*, dispersal, release or escape" is sudden and accidental. (Emphasis added.)

■ Our rejection of these theories relied upon by the Bentzes and Wright–Gardner does not mean that there is no coverage. There still remains the ultimate question of whether the discharge of toxic substance by French was sudden and accidental, giving those terms their common accepted meaning. We think that it was.

■ We start with the proposition that "[t]he cardinal rule in the construction and interpretation of contracts is that effect must be given to the intention of the parties, unless it is inconsistent with some established principle of law." *Kasten Constr. v. Rod Enterprises*, 268 Md. 318, 328, 301 A.2d 12 (1973); *Bruce v. Dyer*, 309 Md. 421, 433, 524 A.2d 777 (1987). All other rules of construction are simply in aid of that "cardinal rule." French was a pesticide applicator. That was his sole business. He was subject to the laws and regulations governing and regulating pesticide applicators. One of those laws, Md.Agric. Code Ann. § 5–206(d), provides that the Secretary of Agriculture

"may establish minimum requirements for financial responsibility *for all damages which may be incurred in the commercial application of pesticides.*" (Emphasis added.) The Secretary has done so. Md.Regs.Code tit. 15, § 05.01.04 B(2), since recodified as § 05.01.06 B(2), required each applicant for a pesticide business license to "[m]eet the requirements for minimum financial responsibility for bodily injury and property damage consisting of liability insurance with [specified minimum limits]."

Mutual Fire was aware of the nature of French's business. The "named insured" was "Wayne J. French t/a French's Termite & Pest Control." Under the heading "Description of Hazards" on the Declaration page of the policy was written "73420–Exterminators–including pest control–excluding the use of gas of any kind, including completed operations." The policy was *not* one of Comprehensive General Liability Insurance, but rather, as clearly reflected on the Declaration page, one of Manufacturers' and Contractors' Liability Insurance. There can be little doubt, in these circumstances, that the parties intended for the policy to cover French's normal operations and thus to meet the requirements of State law.[5] To hold otherwise would make the policy virtually meaningless and the certificate issued by Mutual Fire's agent to the Department of Agriculture misleading, if not close to fraudulent. As Mutual Fire urges us to reject a theory which would have the exclusion swallowed by the exception to it, we similarly

---

**5.** A further regulation of the Department of Agriculture, Md.Regs. Code tit. 15, § 05.01.04B(3), since recodified as § 05.01.06B(3), required licensees to furnish the department a certificate of insurance by an insurance company "licensed to do business in this State." It is not clear whether that regulation was intended to allow policies written by surplus lines insurers approved by the Insurance Commissioner under Md.Ann.Code art. 48A, § 190 or was intended to require that the policy be written by an insurer authorized under § 42 of art. 48A. We need not and do not decide that question in this appeal. No one has suggested that the pollution exclusion clause in the Mutual Fire policy was invalid or ineffective simply because an "admitted" insurer could not have included such a clause at that time.

reject a construction that would have the policy itself swallowed by the exclusion.

There is no allegation here that French deliberately set out to poison the Bentzes' home; the basis of the underlying action, as best we know of it, is that he went about his normal business of treating the home but did so in a negligent manner. To the extent that toxic chemicals thus landed where they were not supposed to land, the discharge was both accidental and sudden. It was accidental in that it was unintended; in the words of Webster's *New Twentieth Century Dictionary Unabridged* 11 (2d ed.1975) definition of "accidental," it "happen[ed] by chance," it was "not expected," it was "fortuitous," it took place "not according to the usual course of things," it was not "constant, regular, or intended." It was sudden in that the inappropriate contact, from which the harm arose, was more or less instantaneous. The chemicals, we presume, were sprayed directly on to the surfaces; they did not seep there. The discharge that caused the harm was from the applicator directly to the targeted surface.

It is for this reason, and not by any strained construction of otherwise clear words, that we find error in the dismissal of Count I of the Complaint. The Bentzes are entitled to a declaratory judgment that their claim is not excluded from coverage by virtue of the pollution exclusion clause, and we shall remand the case for the entry of a proper judgment to that effect. That obviates the need to consider whether the dismissal of Count III was erroneous.

JUDGMENT AS TO COUNT I REVERSED; CASE REMANDED TO CIRCUIT COURT FOR WASHINGTON COUNTY FOR ENTRY OF DECLARATORY JUDGMENT IN ACCORDANCE WITH THIS OPINION; APPELLEES TO PAY THE COSTS.