648 A.2d 1047

**Norman C. BERNHARDT**

v.

**HARTFORD FIRE INSURANCE COMPANY.**

**No. 1754, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Oct. 26, 1994.

Certiorari Granted March 10, 1995.

---

John B. Dunn, Takoma Park, for appellant.

Hugh E. Donovan (Donovan & Broderick, P.C., on the brief), Silver Spring, for appellee.

Argued before GARRITY and DAVIS, JJ., and JOHN F. McAULIFFE, Judge (retired), Specially Assigned.

JOHN F. McAULIFFE, Judge (retired), Specially Assigned.

This appeal is from a summary determination that an "absolute" pollution exclusion clause in a landlord's comprehensive business liability insurance policy excluded claims brought by tenants for personal injury and damages resulting from the escape of carbon monoxide fumes from a heating plant.

Norman C. Bernhardt is the owner of a home in Takoma Park, Maryland, that has been converted into apartments. On 31 January 1992, several tenants in the building were overcome by carbon monoxide and were taken to area hospitals for treatment. According to claims made by the tenants, the source of the carbon monoxide was the central heating system, owned and maintained by the landlord. The tenants contend that the furnace and its related systems were defective, and improperly maintained and operated by the landlord. The attorney for appellant represented to the Circuit Court for Montgomery County that the incident occurred when

> debris, apparently from an old chimney liner, fell into the base of the chimney blocking free air passage from the boiler, so that there was a buildup of carbon monoxide, which then permeated the building, causing injury to the tenants.

Claims made by the tenants, and an action filed on behalf of one of the tenants, were tendered to the Hartford Fire Insurance Company (Hartford), from whom the landlord had earlier purchased a policy that included comprehensive business liability coverage. Hartford denied coverage and refused to provide a defense, contending that the pollution exclusion clause of the policy operated to exclude the claim from coverage.

The landlord brought an action for declaratory relief against Hartford in the Circuit Court for Montgomery County, and tenants having claims against the landlord were permitted to intervene as additional plaintiffs. Hartford answered and moved for summary judgment, contending that the material facts were not in dispute, and that the pollution exclusion clause upon which Hartford relied was dispositive. The motion was heard by Judge James Ryan, who agreed with the insurer and entered summary judgment in its favor, declaring that the pollution exclusion clause was clear and unambiguous and that the landlord was not entitled to a defense or indemnification by Hartford. The landlord appealed to this Court.

The pollution exclusion clause with which we are concerned is contained in an endorsement that was attached to the policy at the inception of a policy period. The endorsement is captioned "Pollution Exclusion," and is prefaced by the following statement, in bold type: **"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY."** The endorsement provides:

It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:

1. to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

a. at or from premises owned, rented or occupied by the named insured;

b. at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste;

c. which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the named insured or any person or organization for whom the named insured may be legally responsible; or

d. at or from any site or location on which the named insured or any contractors or subcontractors working directly or indirectly on behalf of the named insured are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

2. to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Subparagraphs (a) and (d) of this exclusion do not apply to bodily injury or property damage caused by heat, smoke or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

Hartford contends the exclusion applies because the claims are for "bodily injury ... arising out of the actual ... discharge, dispersal, release or escape of pollutants ... at ... premises owned ... by the named insured." The insurer points out that "pollutant" is defined to include "any ... gaseous or thermal irritant or contaminant, including smoke ... fumes ... [and] chemicals."

The landlord does not deny that carbon monoxide is a pollutant within the literal language of the policy exclusion. Nor does he deny that the claims made against him are for personal injuries arising out of the escape of the carbon monoxide at his premises. He argues instead that: 1) notwithstanding the literal language of the exclusion, the parties intended that it apply only to persistent industrial pollution of the environment, and not to an accident of the kind generally covered by a comprehensive business liability policy; and 2) the exception to the exclusion applies because the damage was "caused by ... fumes from a hostile fire."

Addressing the latter contention first, we find nothing in the record to support the landlord's present contention that the injuries could have resulted from a hostile fire. There is simply no evidence or proffer that the fire in the furnace became "uncontrollable" or "[broke] out from where it was intended to be." Although some of the claimants alleged that the landlord exacerbated the problem by setting the thermostat at a higher than normal level, there is no indication that this caused the fire in the furnace to become "hostile" within the meaning of the language of the exclusion. The cause of the release of carbon monoxide, as proffered by counsel for the landlord at the hearing before Judge Ryan, was the blockage of free air passage in the chimney flue, causing a buildup and dispersal of carbon monoxide throughout the building. The exception to the exclusion does not apply.

The landlord's first argument presents a more difficult question. He suggests that the intention of the parties must be gathered not simply from the literal words of the exclusion clause, but from a reading of the policy as a whole, and a consideration of the history and the development of the exclusion clause.

A portion of the history of the exclusion clause was described in *Bentz v. Mutual Fire,* 83 Md.App. 524, 532, 575 A.2d 795 (1990), and is discussed in greater depth in Note, *The Pollution Exclusion Clause Through The Looking Glass,* 74 Geo.L.J. 1237, 1986 (hereinafter, "Through The Looking

Glass"). See, in addition, 1A R. Long, *The Law of Liability Insurance*, § 10A.04[2] & [3] (1990, 1994 supp.); 1 W. Friedman, *Richards On The Law Of Insurance*, § 5:2[d] (1990, 1992 cum. supp.). According to the insurance industry, a recurring problem has been the tendency of some courts to interpret broadly, and sometimes imaginatively, standard general comprehensive liability insurance policies to require coverage for pollution claims. Before 1966, these policies covered only damage "caused by accident." *Through The Looking Glass, supra*, at 1241. Although the insurance industry apparently believed that this would limit coverage to sudden, unexpected, and unintended events easily fixed as to time and place, various definitions of "accident" were handed down by the courts.

The insurance industry responded by changing from "accident" to "occurrence" based coverage in 1966. This type of policy generally defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 1246–47. The insurers apparently believed this definition would exclude claims when damage was the natural and obvious consequence of the regular operation of a business. Not all courts agreed, and claims were allowed in cases where the insureds' ongoing business practices involved the intentional discharge of pollutants but the courts determined that the ultimate loss was neither intended nor expected. *Id.* at 1251.

The next change made by the insurance industry was the adoption of a pollution exclusion clause, generally known as the "ISO-form" or "sudden and accidental" policy exclusion. Added to the general comprehensive liability policies in the early 1970s, this exclusion generally provided as follows:

This policy shall not apply:

To bodily injury arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or

other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental; ....

According to one commentator, this attempt to achieve uniformity of interpretation, and therefore predictability of exposure, fared no better than the previous efforts.

The ISO-form pollution exclusion has been the subject of ongoing controversy from the outset of modern environmental insurance coverage litigation. Some courts have upheld the ISO-form pollution exclusion as clear and unambiguous, while others have held to the contrary.

The federal circuits also have widely disparate decisions on the ISO-form pollution exclusion.

1A R. Long, *The Law Of Liability Insurance, supra,* § 10A.04[2] (footnotes omitted). *See also, St. Paul Fire and Marine Ins. v. Warwick Dyeing,* 26 F.3d 1195, 1200–01 (1st Cir.1994); *Queen City Farms, Inc. v. Aetna Cas. & Surety Co.,* 124 Wash.2d 536, 882 P.2d 703, 715–21 (1994).

The insurance industry returned to the drawing board, and in 1985 adopted the "absolute pollution exclusion"—the exclusion that is applicable in this case. In the view of Long, *The Law Of Liability Insurance, supra,* § 10A.04[3], "[t]he result of the adoption of the absolute pollution exclusion was to severely limit coverage for pollution-related claims."

Whether the absolute pollution exclusion is viewed as clear and unambiguous will, of necessity, depend upon the facts of each case to which it is applied. In a number of cases, where the facts clearly placed the claim within the ordinary meaning of the words of the exclusion, courts have declared the exclusion to be clear and unambiguous, and have applied its literal language. *See, e.g., City of Salina, Kan. v. Maryland Cas. Co.,* 856 F.Supp. 1467 (D.Kan.1994); *American States Ins. Co. v. F.H.S., Inc.,* 843 F.Supp. 187 (S.D.Miss.1994); *Guilford Industries Inc. v. Liberty Mutual Ins. Co.,* 688 F.Supp. 792 (D.Me.1988) *aff'd,* 879 F.2d 853 (1st Cir.1989); *Alcolac Inc. v. California Union Ins. Co.,* 716 F.Supp. 1546 (D.Md.1989);

*Shell Oil v. Winterthur Swiss Ins.*, 12 Cal.App.4th 715, 15 Cal.Rptr.2d 815 (1993); *Perkins Hardwood Lumber v. Bituminous Cas.*, 190 Ga.App. 231, 378 S.E.2d 407 (1989); *Crabtree v. Hayes–Dockside, Inc.*, 612 So.2d 249 (La.App.1992) *writ denied*, 614 So.2d 1257 (1993); *League of Minn. Cities Ins. v. Coon Rapids*, 446 N.W.2d 419 (Minn.App.1989); *U.S. Bronze Powders Inc. v. Commerce & Indus.*, 259 N.J.Super. 109, 611 A.2d 667 (1992); *Budofsky v. Hartford Ins. Co.*, 147 Misc.2d 691, 556 N.Y.S.2d 438 (N.Y.S.Ct.1990). Other courts have held the absolute pollution exclusion ambiguous as applied to particular facts. *See, e.g., Titan Holdings Syndicate v. City of Keene, N.H.*, 898 F.2d 265 (1st Cir.1990) (whether bright lights at night and loud noises constituted pollution within the meaning of the exclusion); *Minerva Enterprises v. Bituminous Cas.*, 312 Ark. 128, 851 S.W.2d 403 (1993) (whether solid and liquid sewage backup from trailer park's septic system constituted "waste" within meaning of exclusion).

In a case factually similar to the case before us, the Court of Appeals of Louisiana noted that under the law of that state "when there is any doubt about the meaning of an agreement, the court must ascertain the common intention of the parties, rather than adhering to the literal sense of the terms," and without stating how the doubt arose, held that "the intent of the insurance industry in adding pollution exclusion clauses to their policies was to exclude coverage for entities which knowingly pollute the environment over a substantial period of time." *Thompson v. Temple*, 580 So.2d 1133, 1135 (La.App. 1991). Thus, the Court held that summary judgment was improperly granted in favor of the insurer where tenants filed claims against their landlord for injuries that resulted from carbon monoxide gas that allegedly leaked from a bathroom heater. The Court did not explain how it divined the intent of the insurer but did cite cases which discussed the earlier version of the pollution exclusion. Nor did the Court explain why the insurer incorporated this exclusion in a homeowner's policy if its intent was as stated.

We do not agree with the landlord's contention that the absolute pollution exclusion is ambiguous when applied to the

facts of this case. In *Cheney v. Bell Nat'l Life,* 315 Md. 761, 766–77, 556 A.2d 1135 (1989), the Court of Appeals said:

> In the interpretation of the meaning of an insurance contract, we accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense. *Id.* at 388, 488 A.2d 486. *Mut. Life Ins. Co. v. Murray,* 111 Md. 600, 605, 75 A. 348 (1909). Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer. Rather, following the rule applicable to the construction of contracts generally, we hold that the intention of the parties is to be ascertained if reasonably possible from the policy as a whole. In the event of an ambiguity, however, extrinsic and parol evidence may be considered. If no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument.

*See also, Bausch & Lomb v. Utica Mutual,* 330 Md. 758, 779, 625 A.2d 1021 (1993). Additionally, the Court has said, to determine the intention of the parties to an insurance contract the instrument as a whole must be construed, and courts should examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution. *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486 (1985).

In *Town & Country v. Comcast Cablevision,* 70 Md.App. 272, 280, 520 A.2d 1129, *cert. denied,* 310 Md. 2, 526 A.2d 954 (1987), this Court explained two varieties of ambiguity that might exist.

> Language can be regarded as ambiguous in two different respects: (1) it may be intrinsically unclear, in the sense that a person reading it without the benefit of some extrinsic knowledge simply cannot determine what it means; or (2) its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain. *See Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69,

517 A.2d 730 (1986): 'That a term may be free from ambiguity when used in one context but of doubtful application in another context is well settled.'

The carbon monoxide gas in this case was a "gaseous ... irritant or contaminant" and constituted "fumes" and "chemicals" within the clear language of the definition of "pollutant." Moreover, the bodily injury claimed by the tenants "arose out of the actual ... discharge, dispersal, ... or escape" of the carbon monoxide, "at ... premises owned ... by the named insured."

We agree that the title of the endorsement—"pollution exclusion"—is, standing alone, ambiguous, and that an insured glancing only at the caption of the endorsement would not understand the breadth of the exclusion. Had the insurer merely stated that "coverage for pollution is excluded," we would agree that application of the ordinary connotation and meaning of that word would not result in exclusion from coverage in this case.

The language of the contract between the parties is, however, quite specific. We are unable to say a person of ordinary intelligence reading the language of this absolute pollution exclusion would conclude that it did not apply to the facts of this case.

▮ The landlord suggests that we judicially draft limitations upon the exception. First, he says, it should be limited to "industrial" or "industry-related" activities. Quite apart from the problems inherent in determining what may or may not be "industry-related," we are required to state the obvious—nowhere in this exclusion does the word "industry" or "industrial" appear. There simply is no such limitation. Moreover, we would be hard pressed to conclude that the insurance industry intended such a limitation in an exclusion it intentionally included as an endorsement in policies covering non-industrial businesses, and indeed, even in homeowner's

policies.[1] Second, the landlord argues that the history of the exclusion suggests the insurance industry was attempting to avoid coverage only where the insured was actually and knowingly emitting pollutants over an extended period of time. The suggestion that only "active" polluters were excluded from the earlier "sudden and accidental" version of the pollution exclusion was considered by this Court in *Bentz v. Mutual Fire, supra,* 83 Md.App. at 535–37, 575 A.2d 795. For reasons there stated we declined to apply that broad theory in *Bentz,* and we are no more persuaded of its validity on this occasion. The absolute pollution exclusion draws no distinction between intentional and non-intentional discharge of pollutants; nor does it in any manner suggest that only chronic emission of the defined pollutants is excluded from coverage. *Cf. Northern Ins. Co. v. Aardvark Associates,* 942 F.2d 189, 194 (3d Cir.1991); *O'Brien Energy v. American Employers,* 427 Pa.Super. 456, 629 A.2d 957, 963 (Pa.Super.1993).

Finally, the landlord suggested to the trial judge that the insurer may be estopped to deny coverage, or may otherwise be somewhat restricted in its reliance upon the absolute pollution exclusion, by reason or representations made by the insurance industry to the insurance commissioner when presenting this endorsement for approval. Specific limitations have been imposed with respect to earlier pollution exclusion clauses because of representations made by the insurance industry to insurance commissioners, *see Queen City Farms, Inc. v. Aetna, supra,* 882 P.2d at 721–23; *Morton Intern., Inc. v. General Acc. Ins. Co.,* 134 N.J. 1, 629 A.2d 831, 847–48, 851–55, (1993). Although there is some reference in the case before us, in answers to interrogatories filed by the insurer, to a letter that was written by someone in the insurance industry to the Insurance Commissioner of Maryland when the absolute pollution exclusion was presented for approval, that letter is not in the record. Accordingly, there is nothing before us to support the argument that the insurer is estopped to deny

---

1. The absolute pollution exclusion at issue in *Thompson v. Temple,* 580 So.2d 1133 (La.App.1991), was contained in a homeowner's policy.

coverage because of representations made to the Insurance Commissioner.

Applying established contract law to the facts of this case, we are obliged to hold that the absolute pollution exclusion clause is clear and unambiguous in this context, and precludes coverage. That being so, the insurer has neither the obligation to defend nor the obligation to indemnify the insured.

Though ultimately lacking in legal efficacy, the landlord's arguments have substantial emotional appeal. It would appear that the insurance industry, perhaps acting out of frustration resulting from its perception of unfair treatment by the courts, or perhaps because of inherent difficulty in defining that which it desires to exclude, has cut with a meat ax rather than with a scalpel. The insurance industry has constructed an "absolute" exclusion so broad in its application that it sweeps away coverage well beyond that which might be required to meet the industry's legitimate aims. It has done so, however, at least in the context of this case, in contract language that is clear and unambiguous.

It is not the function of courts to rewrite the contracts of parties, even when enforcement of the contract as written may result in hardship. *Canaras v. Lift Truck Services,* 272 Md. 337, 350, 322 A.2d 866 (1974); *Hankins v. Pub. Ser. Mut. Ins. Co.,* 192 Md. 68, 84, 63 A.2d 606 (1949). It may well be, however, that because of the breadth of the exclusion as written, the possible absence of necessity for an exclusion of this type to address legitimate concerns of the insurance industry, and the lack of effective bargaining power on the part of many insureds, the Insurance Commissioner and/or the General Assembly may wish to consider mandatory revision of the absolute pollution exclusion.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**