Delores SCHMID, as trustee for and on behalf of the heirs and next of kin of Robert Schmid, Plaintiff,

v.

FIREMAN'S FUND INSURANCE COMPANY, INC., a California corporation, Defendant.

No. CIV. 98–2355 ADM/AJB.

United States District Court, D. Minnesota.

May 30, 2000.

David E. Wandling, Christopher W. Fowlkes, Wandling Uggen Rugara Fowlkes, LLC, Minneapolis, MN, for Plaintiff.

Robert E. Salmon, Renee Fearing, Meagher & Geer, Minneapolis, MN, Jon E. Elenius, Caron, Constants & Wilson, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

The above-titled matter came on for hearing before the undersigned United States District Judge on April 18, 2000, pursuant to Defendant Fireman's Fund Insurance Company, Inc.'s ("Defendant") and Plaintiff Delores Schmid's ("Plaintiff") cross motions for summary judgment. Plaintiff seeks declaratory judgment that Defendant must provide insurance cover-age for a settlement reached in her wrongful death claim brought in state court. For reasons set forth below, Plaintiff's motion [Doc. No. 27] is granted and Defendant's motion [Doc. No. 22] is denied.

### II. BACKGROUND

#### A. Parties

Plaintiff is trustee for and on behalf of the heirs and next of kin of Robert Schmid ("Schmid"), who died of carbon monoxide poisoning in a basement room at the Sunshine Factory Restaurant and Bistro ("Sunshine Factory" or "restaurant") in New Hope, Minnesota. Schmid was an employee of the Sunshine Factory, which is owned and operated by Rosengren & Sons ("Rosengren"). Defendant is Rosengren's commercial general liability insurance carrier.

#### B. Factual Background

On January 17, 1997, Schmid drank three highball whiskey drinks at the Sunshine Factory's bar area after he finished his shift at 3:28 p.m. Schmid called his roommate to ask for a ride home, but before his roommate arrived, Schmid went into the restaurant's boiler room in the basement. He was found dead two days later by a Sunshine Factory employee. *See* Affidavit of Robert E. Salmon, Ex. B at 1. An autopsy report found Schmid's blood carbon monoxide level to be 62% and determined the cause of death to be carbon monoxide poisoning. *See* Salmon Aff., Ex. E at 1.

On January 19, 1997, the day Schmid's body was found, officials from the local gas company and the New Hope Fire and Police Departments conducted tests of equipment in the boiler room to determine the source of the carbon monoxide. *See* Salmon Aff., Ex. B at 5. The room contained two water heaters, one manufactured by Rheem and one manufactured by A.O. Smith. The officials turned on both water heaters and discovered that after fifteen minutes, the carbon monoxide level in the

ambient air of the boiler room reached 800 parts per million ("ppm"), a level at which death can occur within two to three hours. *See id.* The officials also found the Rheem heater to be malfunctioning because it was producing nearly 250 times the amount of carbon monoxide as the A.O. Smith heater, according to measurements taken from each heater's exhaust.[1] *See id.* The Rheem heater was removed from the premises.

An inspection by New Hope officials on January 28, 1997, revealed that the duct work for the Rheem exhaust system was severely deteriorated and may have contributed to carbon monoxide build-up in the boiler room. *See* Salmon Aff., Ex. F. Chad Tomkins ("Tomkins"), a plumber who assisted in replacing the venting system, stated that exhaust gases from the Rheem heater were likely coming back into the boiler room through the corroded holes in the duct work. *See* Salmon Aff., Ex. G at 20, 29. Tomkins's supervisor also noted that the fresh air intake piping was partially blocked by snow. *See id.* at 40, 43–44.

The Rheem water heater was taken to the facilities of Crane Engineering, where expert witnesses retained by the heater's manufacturer could inspect the heater. *See* Pl.'s Ex. F [2] (Affidavit of Keith L. Naeve) ¶ 6. The experts put the heater through three separate tests to determine its carbon monoxide output. During the first test, conducted January 12, 1999, the water heater produced and maintained a maximum carbon monoxide output of 3,408 ppm after five minutes of continuous operation. *See id.* ¶ 12. Such an output can result in death in less than one hour.

In the second test, conducted April 8, 1999, the heater again produced carbon monoxide levels in excess of 3,000 ppm.

*See id.* ¶ 15. The testers attempted to isolate the source of the excessive output, and focused on the heater's burner pan. During the testing, the testers observed "flame rollout," in which the fire rolled out from under the water heater's combustion chamber and onto the heater's outside shell. *See id.* ¶ 16. The testers attributed the flame rollout to the deformed burner pan, which could not be properly positioned below the rectangular opening of the combustion chamber. *See id.* ¶ 17. Because of the pan's corrosion and deformed condition, it was sitting about three inches off its intended position. *See id.* The experts concluded that the flames, when not properly contained within the combustion chamber, were cooled by contact with the metal bottom of the water heater, which significantly contributed to the high levels of carbon monoxide output. *See id.* ¶ 19. The testers moved the pan around and discovered that carbon monoxide levels decreased as it was more closely aligned to its designed position underneath the combustion chamber. *See id.* ¶ 20.

During a third series of tests, also conducted on April 8, 1999, the testers replaced the deformed pan with a new, exemplar pan. They discovered the carbon monoxide levels from the heater dropped to 86 ppm, which is an acceptable level for flue gases, when the pan was properly attached below the combustion chamber. *See id.* ¶ 21. The testers then moved the new pan to a position about three inches away from its proper position and once again observed flame rollout and a carbon monoxide level of 3,397 ppm. *See id.* ¶ 22. The testers then placed the pan about one and a half inches off its proper position and recorded a carbon monoxide level of 2,100 ppm. *See id.* ¶ 23. The experts concluded from the tests that the amount

---

**1.** The officials measured a level of 1,000 ppm from the exhaust of the Rheem heater and a level of 4 ppm from the A.O. Smith heater. *See* Salmon Aff., Ex. B at 5.

**2.** Plaintiff's exhibits and affidavits were attached directly to her Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Separate Motion for Summary Judgment rather than to an individual's affidavit. Hereinafter, each exhibit will be cited as "Pl's Ex."

of carbon monoxide produced was proportionate to the burner pan's distance from its proper position underneath the combustion chamber. *See id.* ¶ 24.

## C. Procedural Background

Plaintiff filed her wrongful death suit against Rosengren and other defendants on August 12, 1998. Plaintiff entered into settlement agreements with each of the defendants, including an agreement with Rosengren in accordance with *Miller v. Shugart,* 316 N.W.2d 729 (Minn.1982). The *Miller–Shugart* agreement provided that Rosengren would be liable for the agreed settlement amount if Schmid's injury was determined to be covered by the commercial general liability insurance policy. Defendant denied coverage based on one of the policy's coverage exclusions. Rosengren initiated a declaratory judgment action against Defendant seeking coverage, then agreed to be substituted by Plaintiff in the action.

## D. The Insurance Policy

The policy in effect at the time of Schmid's death states:

> We will pay those sums that the insured becomes legally obligated to pay as liquidated damages because of **bodily injury** or **property damage** to which this insurance applies. We will have the right and duty to defend any **suit** seeking those damages. We may at our discretion investigate any **occurrence** and settle any claim or **suit** that may result.

Salmon Aff., Ex. K at 1 (emphasis in original). The policy also outlines several exclusions to coverage, including one commonly known as an "absolute pollution exclusion." It states:

> (1) **Bodily injury** or **property damage** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
>
>> (a) At or from any premises, site or location which is or was at any time

owned or occupied by, or rented or loaned to, any insured,

> \* \* \* \* \* \*
>
> (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
>
>> (i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or
>>
>> (ii) if the operations are to test for, monitor, clean up, remove, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

*Id.* at 2 (emphasis in original). The policy also defines what qualifies as a pollutant:

> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned and reclaimed.

*Id.,* Ex. K at 3. An exception to the exclusion, known as the "hostile fire" exception, states:

> Subparagraphs (a) and (d)(i) do not apply to **bodily injury** or **property damage** arising out of heat, smoke or fumes from a hostile fire.
>
> As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

*Id.,* Ex. K at 2–3 (emphasis in original).

Defendant contends it was correct in denying coverage given the language of the absolute pollution exclusion. Plaintiff argues the hostile fire exception restores coverage.

## III. DISCUSSION

## A. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judg-

ment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of stating grounds for its motion and demonstrating the lack of issues of genuine material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the opposing party may not simply rest on the allegations or denials of its pleadings, but must come forward with sufficient evidence to demonstrate a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When evaluating the parties' submissions on a motion for summary judgment, the evidence of the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A dispute concerning a material fact is "genuine" and sufficient to overcome a summary judgment motion "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

## B. Insurance Policy Interpretation

### 1. Interpretation principles

Interpretation of an insurance policy is a question of law to be decided by the court. *See Jenoff, Inc. v. New Hampshire Ins. Co.,* 558 N.W.2d 260, 262 (Minn. 1997). In interpreting a policy's terms, a court must ascertain and give effect to the intentions of the parties. *See id.* When terms are not specifically defined and are unambiguous, they must be given their plain, ordinary meaning. *See id.* Ambiguous terms are to be resolved in favor of the insured and against the insurer, in accordance with the insured's reasonable expectations. *See id.* Ambiguity exists if a term is reasonably subject to more than one meaning. *See id.*

### 2. The hostile fire exception

Defendant argues that the absolute pollution exclusion bars coverage for damages arising from Schmid's death. Plaintiff does not dispute that the exclusion included in the policy would exclude coverage for carbon monoxide emissions within the restaurant. Plaintiff instead argues that the hostile fire exception restores coverage. In the event the hostile fire exception does not restore coverage, Plaintiff alternatively attacks the absolute pollution exclusion on the ground that it is unenforceable because Defendant failed to give adequate notice to Rosengren when the wording of the exclusion was changed in the course of a policy renewal.

This Court assumes without deciding that the pollution exclusion is clear and unambiguous and would bar coverage when carbon monoxide fumes are released inside a building. *See Board of Regents v. Royal Ins. Co. of Am.,* 517 N.W.2d 888, 893–94 (Minn.1994) (absolute pollution exclusion bars coverage for damages resulting from release of asbestos fibers within a building); *League of Minn. Cities Ins. Trust v. City of Coon Rapids,* 446 N.W.2d 419, 422 (Minn.Ct.App.1989) (absolute pollution exclusion bars coverage for damages resulting from a release and build up of nitrogen dioxide from a Zamboni machine inside an ice rink); *but see American States Ins. Co. v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 82 (1997) (finding that accidental release of carbon monoxide due to broken furnace is not within the absolute pollution exclusion).

Minnesota state courts have not addressed a situation in which the hostile fire exception has applied. Federal courts have held, however, that such an exception is enforceable. *See Hawkins Chem., Inc. v. Westchester Fire Ins. Co.,* 159 F.3d 348, 355 (8th Cir.1998) (affirming a Minnesota district court's ruling that a hostile fire

exception obligated insurer to defend insured).

The language of the exception defines a hostile fire as "one which becomes uncontrollable or breaks out from where it was intended to be." The policy does not further define the terms used in this definition, and the language is not ambiguous. Although Plaintiff cites the Black's Law Dictionary definition of "hostile fire," it is the meaning of "uncontrollable" and "breaks out from where it was intended to be" that are the key operative phrases at issue. Plaintiff argues that "breaks out from where it was intended to be" simply means that a fire is burning in a location other than where it was intended to burn. Plaintiff further argues that "uncontrollable" means a fire that burns in its intended location but burns in a manner different than intended. Defendant proffers no specific rebuttal on the meaning of the operative phrases. Plaintiff's interpretation of "breaks out from where it was intended to be" is correct and needs no elaboration.

■ Plaintiff's interpretation of "uncontrollable," however, is only partially correct in that it means a fire burning in a manner different than intended. The plain, ordinary meaning of "uncontrollable" is "incapable of being controlled." *Webster's New Collegiate Dictionary* 1273 (1977). "Control" means "power or authority to guide or manage." *Id.* at 247. In the context of a fire, an uncontrollable fire is one that a person cannot contain, guide, or extinguish. Plaintiff's interpretation is axiomatic in that a fire incapable of being controlled is usually burning in a manner different than intended. The meaning of "uncontrollable" is not, however, limited to a fire burning only in its intended location. A fire can be both uncontrollable and burning in a location other than where it was intended to burn. The placement of "or" in the language "uncontrollable or breaks out from where it was intended to be" means that a fire could be *either* uncontrollable (whether within its intended location or elsewhere) *or* broken

out from where it was intended to burn (whether controllable or uncontrollable) and still fall within the hostile fire exception.

Defendant cites as authority two non-Minnesota cases that discuss the applicability of the hostile fire exception but hold that it does not mandate coverage. Both cases involve factual scenarios in which the insureds sought coverage through the hostile fire exception for liability to third parties injured by carbon monoxide fumes from malfunctioning furnaces. *See Bernhardt v. Hartford Fire Ins. Co.*, 102 Md. App. 45, 648 A.2d 1047 (1994); *Owners Ins. Co. v. Singh*, 1999 WL 976249 (Ohio App.1999) (unpublished). In *Bernhardt*, the court found that the insured had offered no evidence that the fire in the furnace had become "uncontrollable" or had "broken out from where it was intended to be." *Bernhardt*, 648 A.2d at 1049. In *Singh*, the court also held that the insured had not presented evidence that the flame from the furnace caused the presence of carbon monoxide fumes. *Singh*, 1999 WL 976249 at *4. Both of these cases are distinguishable in that the instant Plaintiff has provided evidence to support her contention that the carbon monoxide in the room at the time of Schmid's death was produced by the Rheem heater and that the fire in the burner pan was not burning where is was intended to be.

■ In this case, it is undisputed that no one saw flame rollout coming from the Rheem heater the day it was tested and removed from the Sunshine Factory, and there is no evidence that flame rollout occurred the day Schmid died. However, Plaintiff has presented evidence that raises an inference that the fire from the heater's burner pan was burning in an unintended location. Plaintiff's experts discovered the burner pan was deformed and corroded when they tested the heater two years after Schmid's death. They also discovered the pan was positioned three inches out of alignment. It is reasonable to believe that the burner pan was in the same condi-

tion and position the day of Schmid's death since the heater had not been used in the intervening two years.

The fire in the case at bar does not fall under the "uncontrollable" prong of the definition because the flame was capable of being turned off. A fire burning three inches from its intended location in the combustion chamber does, however, fit the definition of "breaks out from where it was intended to be." Furthermore, Plaintiff's testing leads to the reasonable inference that it was the misplacement of the fire that caused the excessive levels of carbon monoxide. If the pan had been properly placed underneath the combustion chamber, it likely would have produced an acceptable level of carbon monoxide that would not have endangered Schmid. The New Hope police report also supports the inference that the Rheem heater was producing excessive amounts of carbon monoxide in comparison to the A.O. Smith heater at the time Schmid's body was found.

Whether the corroded flue or blocked fresh air hose contributed to the build-up of carbon monoxide in the boiler room is only collateral. If the carbon monoxide is produced by a regular, non-hostile fire, then there is no coverage even if it builds up in a room. If the carbon monoxide comes from a hostile fire and accumulates, then coverage exists.

Thus, the carbon monoxide that caused Schmid's death came from a hostile fire, and Defendant is bound by the exception to the absolute pollution exclusion to provide coverage. Since the hostile fire exception restores coverage, there is no need to address Plaintiff's alternative argument that the exclusion is not applicable for lack of adequate notice to Rosengren. Given that there are no fact issues in dispute, Plaintiff is entitled to judgment as a matter of law.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's motion for summary judgment [Doc. No. 27] is **GRANTED;** and

2.  Defendant's motion for summary judgment [Doc. No. 22] is **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**