**BERETTA, U.S.A., CORP.**

v.

**FEDERAL INSURANCE CO., et al.**

No. Civ. CCB–99–2798.

United States District Court,
D. Maryland,
Southern Division.

Sept. 29, 2000.

---

Michele A. Gallagher, Anderson Kill & Olick, LLP, Washington, DC, Daniel J. Healy, Anderson Kill & Olick, L.L.P. PH, New York City, Jeremy J. Flanagan, Anderson Kill & Olick, L.L.P. PH, Washington, DC, Finley T. Harckham, Anderson Kill & Olick, L.L.P. PH, New York City, for Beretta U.S.A. Corp., plaintiff.

Joseph H. Young, Hogan & Hartson, LLP, Baltimore, MD, Jonathan A. Constine, Hogan and Hartson, PH, Washington, DC, for Federal Insurance Company, defendant.

## *MEMORANDUM*

BLAKE, District Judge.

Besieged by lawsuits brought by municipalities against it and other gun manufacturers across the country, plaintiff Beretta U.S.A. Corporation ("Beretta"), a Maryland corporation, seeks a declaratory judgment that defendants Federal Insurance Company ("Federal") and Great Northern Insurance Company ("Great Northern") owe a duty to defend and indemnify Beretta in those lawsuits under the terms of general liability and premises/operations liability policies issued to Beretta by the defendants annually since 1990. The companies rely on the "Products–Completed Operations Hazard" exclusion in the policies to deny both defense and coverage. The issues have been fully briefed and argued in cross-motions for summary judgment and at oral argument heard on May 12, 2000.[1] For the reasons that follow, I will deny Beretta's motion and grant summary judgment to Federal and Great Northern.

Federal and Great Northern issued commercial insurance policies (the "Primary Policies") to Beretta effective July 31, 1990 through December 31, 1999. *See* Compl., Ex. A (list of the Insurance Policies); Defs.' Mem.Supp.Mot. to Dis., Exs. 1–10 (copies of the Primary Policies). The Primary Policies provided that the Defendants would pay "damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of: bodily injury or property damage caused by an occurrence; or personal injury or advertising injury." *See* Defs.' Mem.Supp.Mot. to

---

1. Letters with supplemental authority were submitted by both sides in August 2000.

Dis., Ex. 1 (1990–91 Policy, Commercial General Liability Insurance, Coverage at 1).[2] Each of the Primary Policies had a commercial general liability limit of $1,000,000 per occurrence with an aggregate limit of $2,000,000. *See, e.g., id.,* Ex. 1 (1990–91 Policy, Declarations).

The Policies defined "bodily injury" to include physical injury, sickness or disease, while "property damage" included "physical injury to tangible property ... or loss of use of tangible property that is not physically injured." *See, e.g., id.,* Ex. 7 (1995–96 Policy, Liability Insurance Section, General Liability at 19, 24).[3]

Central to this controversy is the "Products–Completed Operations Hazard" exclusion. The term "Products–Completed Operations Hazard" is defined to include "all bodily injury and property damage occurring away from premises you own or rent and arising out of your product ... except: products that are still in your physical possession ..." *See, e.g., id.,* Ex. 7 (1995–96 Policy, Liability Insurance Section, Premises/Operations at 21); Ex. 9 (1997–98 Policy, Liability Insurance Section, General Liability at 23). "Your product" is defined as "any goods or products ... manufactured, sold, handled, distributed or disposed of by ... you," including "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your product; and the providing of or failure to provide warnings or instructions." *See, e.g., id.,* Ex. 8 (1996–97 Policy, Liability Insurance, Premises/Operations Section at 22–23).

The Primary Policies did not include coverage for the "Products–Completed Operations Hazard." The policies in effect from July 31, 1990 through December 31, 1996 stated that "[t]his insurance does not apply to ... bodily injury or property damage included within the products-completed operations hazard." *See, e.g., id.,* Ex. 2 (1991–92 Policy, Commercial General Liability Insurance Amendment). The Primary Policies effective July 31, 1990 through December 31, 1995 also provided that "[i]nsurance applies only to those coverages for which a Limit of Insurance is shown," and none of those policies included a Limit of Insurance for the Products–Completed Operations Hazard. *See, e.g., id.,* Ex. 3 (1992–93 Policy, Commercial General Liability Insurance, Declarations). The Policies effective December 31, 1996 through December 31, 1999 each stated that "the Products–Completed Operations Aggregate Limit [listed on the Declarations Page] is the most we will pay for damages ... included in the products-completed operations hazard," but set forth no Products–Completed Operations Aggregate Limit on the Declaration Page. *See, e.g., id.,* Ex. 8 (1996–97 Policy, Liability Insurance Section, General Liability at 7).[4]

In addition to the Primary Policies, the defendants issued umbrella and excess insurance policies to Beretta for the period from July 31, 1992 through December 31, 1999 (the "Umbrella Policies"). The Umbrella Policies provided liability limits of $10 million in excess of the underlying coverage. *See, e.g., id.,* Ex. 11 (1992–93

---

**2.** The commercial general liability clause changed slightly for the period from December 31, 1995 through December 1999, but the difference is not relevant to the issues which are the subject of this opinion. Between December 31, 1996 and December 31, 1998, the Primary Policies also included premises/operations liability insurance coverage. The coverage clause was identical to that for the general commercial liability coverage. *See, e.g.,* Defs.' Mem Supp.Mot. to Dis., Ex. 7 (1995–96 Policy, Liability Insurance Section, Premises/Operations at 5).

**3.** Slight differences exist between the definitions of "bodily injury" and "property damage" in the 1990–1995 and the 1996–1999 policies. Again, the differences are not material to the issues in this memorandum.

**4.** Two of the Policies included the notation "NOT COVERED" in the space for a Products–Completed Operations Aggregate Limit on the Declarations page. *See id.,* Ex. 8 (1996–97 Policy, Liability Insurance Section, Declarations); Ex. 9 (1997–98 Policy, Liability Insurance Section, Declarations).

Umbrella Policy, Declarations). The Declaration page of each Umbrella Policy provided that Products–Completed Operations Hazard coverage was "[e]xcluded" and each contained a Products–Completed Operations Hazard exclusion stating that the insurance does not apply to "any liability arising out of the products-completed operations hazard." *See, e.g., id.*, Ex. 12 (1993–94 Umbrella Policy, Declarations and Endorsement No. 7).[5]

Defendants have been notified by Beretta of thirteen lawsuits filed against it and other gun manufacturers (as well as gun dealers and gun industry trade associations): twelve of the actions have been brought by municipal governments, the thirteenth is a class action. *See* Compl., Ex. B (list of underlying lawsuits); Defs.' Mem.Supp.Mot. to Dis., Ex. 18–30 (copies of the complaints in all thirteen Underlying Actions). The actions allege "negligent marketing and distribution of guns and public nuisance, and seek to recover expenses allegedly incurred in treating and caring for people who have suffered gunshot injuries." Compl. ¶ 9.

Plaintiffs in the Underlying Actions assert three types of claims against Beretta, all of which stem from Beretta's sale and manufacture of handguns. First, the municipalities assert products liability claims for the failure to make guns safe and to prevent foreseeable misuse. The plaintiffs allege that Beretta's products are inherently unsafe because they can be fired by anyone who gains access to them, even though the technology exists to incorporate locks and other safety devices that would prevent guns from being used by children and unauthorized persons. *See, e.g.*, Defs.' Mem.Supp.Mot. to Dis., Ex. 19 at 1–2. The plaintiffs also allege that Beretta failed to provide adequate warnings about the dangers of their guns. *See, e.g., id.*, Ex. 21 at 5.

The second alleged basis for liability is the negligent distribution and marketing of guns. Several of the Underlying Actions contend that Beretta designed, manufactured, and marketed guns in excess of the demand that might be expected from legitimate consumers, guaranteeing that the surplus would enter the illegal firearms market. *See, e.g., id.*, Ex. 18 ¶ 2, 6. On theories of nuisance and unjust enrichment, the complaints seek recovery of the money cities have to spend on health care and public safety. *See, e.g., id.* ¶ 101; Ex. 21 at 39.

Finally, the plaintiffs allege that Beretta engaged in deceptive marketing and advertising of its products, by promoting the false notion that gun ownership and possession of handguns in the home increases one's security. *See, e.g., id.*, Ex. 21 at 32–33. Several municipalities claim that Beretta violated applicable state unfair and deceptive trade practices statutes. *See, e.g., id.* at 33.

The plaintiffs in the Underlying Actions seek both compensatory and punitive damages.

At issue is the scope of the Products–Completed Operations Hazard exclusion (hereinafter "products-hazard exclusion"). Federal and Great Northern contend that all of the claims in the Underlying Actions involve bodily injury or property damage occurring away from Beretta's premises and "arising out of" Beretta's product, and that, therefore, no duty to defend or indemnify may be imposed. *See* Defs.' Mem.Supp.Mot. to Dis. at 14–16. Beretta, on the other hand, contends that the common interpretation of the products-hazard exclusion and the phrase "arising out of"

---

5. The language of the 1992–93 Umbrella Policy differed slightly. It provided that "it is agreed that this policy does not apply to the products hazard or completed operations hazard." *Id.*, Ex. 11 (1992–93 Umbrella Policy, Endorsement No. 11). The policy defined "products hazard" as "[a]ll bodily injury and property damage occurring away from premises you own or rent and arising our of your product or your work, EXCEPT ... products that are still in your physical possession; or ... work that had NOT yet been completed or abandoned." *Id.*, Ex. 11 (1992–93 Umbrella Policy, Definitions at 18).

limits the exclusion to allegations involving the dangerous and defective nature of its product, and the failure to warn of those dangers. *See* Pl.'s Mem.Opp.Mot. to Dis. at 8. Thus, Beretta asserts that a defense and coverage must be provided for the other claims in the Underlying Actions, such as negligent marketing and distribution and false advertising.

The defendants assume, and Beretta does not disagree, that Maryland law controls in this diversity action concerning policies sold in Maryland. *See Assicurazioni Generali v. Neil,* 160 F.3d 997, 1000 (4th Cir.1998). Under Maryland law, "an insurer has a duty to defend its insured if there is a potentiality that the claim may be covered by the policy; that obligation is ordinarily determined by the allegations in the underlying tort action." *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 667 A.2d 617, 619–20 (1995). The duty to defend does not arise unless those allegations state a legal claim that is within the coverage of the policy. *Reames v. State Farm Fire & Cas. Ins.,* 111 Md.App. 546, 683 A.2d 179, 186 (1996).

■ In determining an issue of insurance coverage under Maryland law, "the primary principle of construction is to apply the terms of the insurance contract itself." *Kendall v. Nationwide Ins. Co.,* 348 Md. 157, 702 A.2d 767, 771 (1997) (internal quotation marks omitted) (*quoting Bausch & Lomb, Inc. v. Utica Mutual Ins. Co.,* 330 Md. 758, 625 A.2d 1021, 1031 (1993)). As explained by the Fourth Circuit,

> [g]enerally, Maryland law does not compel a court to ignore an insurance policy's plain language and ordinary meaning. Quite the contrary, Maryland's highest court has repeatedly noted that '[i]n the interpretation of the meaning of an insurance contract,' it 'accord[s] a word its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense.'

*Neil,* 160 F.3d at 1001 (quoting *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 556 A.2d 1135, 1138 (1989); citing *Chantel Assoc. v. Mt. Vernon,* 338 Md. 131, 656 A.2d 779, 784–85 (1995)). The Maryland Court of Appeals has explained that:

> Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer. Rather, following the rule applicable to the construction of contracts generally, we hold that the intention of the parties is to be ascertained if reasonably possible from the policy as a whole.

*Kendall,* 702 A.2d at 771 (*quoting Cheney v. Bell,* 556 A.2d at 1138.) Only if a policy is ambiguous should the court consider extrinsic and parol evidence to determine the intention of the parties. Whether ambiguity exists depends on whether "the language in an insurance policy suggests more than one meaning to a reasonably prudent layperson," and "[a] term which is clear in one context may be ambiguous in another." *Sullins,* 667 A.2d at 619.

Applying these principles, both sides agree that the first prong of the products-hazard exclusion applies to all three types of claims because the injuries for which damages are sought in the Underlying Actions occurred away from Beretta's premises. The critical dispute concerns the meaning of the phrase "arising out of" Beretta's product. Beretta essentially contends that an injury does not "arise out of" its product unless there is something defective in the firearm itself; the insurance companies disagree, and contend that the products hazard exclusion applies to all the claims in the underlying actions. *See* Pl.'s Mem.Opp.Mot. to Dis. at 8; Mem. Supp.Defs.' Mot. to Dis. at 14.

■ The phrase "arising out of" has been broadly interpreted under Maryland law. The Court of Appeals has explained that "[t]he words 'arising out of' must be afforded their common understanding, namely, to mean originating from, growing out of, flowing from, or the like." *North-*

*ern Assurance Co. v. EDP Floors, Inc.,* 311 Md. 217, 533 A.2d 682, 688 (1987) (citations omitted). *See also National Union Fire Ins. Co. v. CSX Corp.,* 982 F.Supp. 1050, 1052 (D.Md.1997) (noting that "[u]nder Maryland law, the phrase 'arising out of' must be afforded its common meaning—originating from, flowing from, or growing out of"), *vacated on other grounds,* 155 F.3d 560 (4th Cir.1998); *Mass Transit Admin. v. CSX Transp., Inc.,* 349 Md. 299, 708 A.2d 298, 306 (1998) (same); *National Indemnity Co. v. Ewing,* 235 Md. 145, 200 A.2d 680, 682 (1964) (noting that Maryland courts have traditionally given a "broad construction" to the phrase "arising out of" under the Workmen's Compensation Act). *Northern Assurance* is particularly instructive. Interpreting a provision that excluded coverage for "bodily injury ... arising out of the ... loading or unloading of [a truck]," the court found that coverage properly had been denied on a claim for negligence in hiring, supervision and retention of an employee who was intoxicated on the job and subsequently injured the plaintiff by his actions during the unloading of a truck. *Northern Assur.,* 533 A.2d at 686, 689. The court explained that

> if [the plaintiff's] bodily injury arose out of EDP's employee's unloading of the truck, then that injury is excluded from coverage. This is so regardless of whether the injury may also be said to have arisen out of other causes further back in the sequence of events, such as the employee's consumption of alcohol, or the employer's negligent failure to supervise the employee. The exclusion also applies irrespective of the theory of liability by which [the plaintiff] seeks redress for his injury, as the policy exclusion is not concerned with theories of liability.

*Id.* at 688–89. The Court of Appeals reaffirmed this reasoning in *Mass Transit v. CSX,* explaining that the phrase "arising

out of" implies only "but for" causation, rather than proximate or even some "intermediate" form of causation. 708 A.2d at 307.

In a case virtually identical to this, the First Circuit recently examined the meaning of the phrase "arising out of," contained in a product-hazards exclusion to a policy issued under Massachusetts law. *Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co.,* 220 F.3d 1 (1st Cir.2000). A firearms distributor was sued on theories of negligent or wilful distribution, marketing, and advertising of excessive numbers of guns, which allegedly resulted in bodily injury to the plaintiffs. The plaintiffs did not claim that the bodily injury involved was directly inflicted by that distributor's product. Accordingly, the First Circuit construed the claim as an allegation that "the injury was caused by the appellant's conduct and not the appellant's products." 220 F.3d at 5. The court relied on Massachusetts case law, which gives a broad reading to the phrase "arising out of" as indicating "a wider range of causation than the concept of proximate causation in tort law ... somewhere between proximate and 'but for' causation—an intermediate standard." [6] Relying also on cases that require consideration of "the 'source from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint,'" 220 F.3d at 7, the First Circuit ultimately agreed with the district court in concluding that the exclusion barred both defense and indemnity coverage for the gun manufacturer, *id.* at 8–9.

■ Beretta also makes the somewhat distinct argument that the products-hazard exclusion historically has been interpreted by other courts and understood by the insurance industry to apply only to defective product and failure to warn claims, rather than negligent sale. It has cited a

---

**6.** On this point, Maryland law is broader than that of Massachusetts. *See Mass Transit,* 708

A.2d at 307 (finding that "arising out of" implies only "but for" causation).

number of cases from other jurisdictions which reach that conclusion.[7]

In analyzing that contention, it is first necessary to examine the language of the policy itself. As noted, the products-hazard provision excludes coverage for "all bodily injury ... occurring away from premises you own or rent and arising out of your product...." *See, e.g.,* Mem.Supp. Defs.' Mot. to Dis., Ex. 7 (1995–96 Policy, Liability Insurance Section, Premises/Operations at 21). Nothing in that language supports the proposition that the exclusion applies only to defective products. As the First Circuit held in *Brazas:*

> Where, as here, the language of the exclusion provision is unambiguous, the text should be given its plain meaning. In this case, the plain meeting of the exclusion is that it applies to all product-related injuries.

*Brazas,* 220 F.3d at 6 (citing *Cobbins v. General Accident Fire & Life Assurance Corp., Ltd.,* 53 Ill.2d 285, 290 N.E.2d 873, 877 (1972)). In holding that the plain language of the exclusion was not limited to defective products claims, the First Circuit applied principles of insurance contract construction virtually identical to the principles applied under Maryland law. *See id.* at 4–5. While Beretta may be correct that a greater number of jurisdictions have adopted its reading of the product-hazard exclusion, that fact cannot alter the application of clearly established Maryland law, which this court is bound to follow.

Beretta makes several additional arguments in support of its position, none of which ultimately are persuasive. To the extent that the heading of the exclusion— "Product–Completed Operations Hazard"—might be considered ambiguous, the heading is not sufficient to render the language of the contract itself ambiguous. *Bernhardt v. Hartford Fire Ins. Co.,* 102 Md.App. 45, 648 A.2d 1047, 1051 (1995), *cert dismissed* 338 Md. 415, 659 A.2d 296 (1995) (holding that the pollution exclusion at issue precluded coverage for injuries resulting from a blocked chimney flue).

Beretta also points to the conflicting decisions from other jurisdictions about the scope of the product hazard exclusion as evidence of ambiguity.[8] While the Maryland Court of Appeals has held that "conflicting interpretations of policy language in judicial opinions is ... a factor to be considered in determining the existence of ambiguity," the court also held that a conflict in judicial interpretation was not dispositive on the issue of ambiguity. *Sullins,* 667 A.2d at 624. Not all of the conflicting cases involved identical language; more importantly, not all states have adopted the principles of contract interpretation or the broad definition of "arising out of" that the Maryland courts employ. Again, conflicting interpretations from other jurisdictions do not create ambiguity where Maryland courts have adopted a definitive interpretation under Maryland law. *See Willis v. Allstate Ins. Co.,* 88 Md.App. 21, 591 A.2d 896, 900–02 (1991); *McCloskey v. Republic Ins. Co.,* 80 Md.App. 19, 559 A.2d 385, 387 (1989).

Finally, Beretta relies on decisions from other jurisdictions to invoke the principle stated in *Stanley v. American Motorist Ins. Co.* that

> parties who adopt an insurance policy, which apparently has had nationwide use and has been judicially construed in five or six states, adopt with it the uniform judicial construction that it has received in other states.

195 Md. 180, 73 A.2d 1, 4 (1950). The provision at issue in this case, however, has not been uniformly construed. Well

---

7. *See, e.g., Scarborough v. Northern Assurance Co. of America,* 718 F.2d 130, 136 (5th Cir. 1983) (applying Louisiana law); *Colony Ins. Co. v. H.R.K., Inc.,* 728 S.W.2d 848, 851 (Tex. Ct.App.1987); *Lessak v. Metropolitan Cas. Ins. Co.,* 168 Ohio St. 153, 151 N.E.2d 730, 735 (1958); *Farm Bureau Mut. Ins. Co. of Arkansas, Inc. v. Lyon,* 258 Ark. 802, 528 S.W.2d 932, 934 (1975).

8. *See* n. 7, *supra.*

before the issuance of these policies to Beretta, for example, the Supreme Court of Illinois held that:

> [t]he definition of the 'products' hazard does not permit the interpretation that it applies only to the typical product-liability or defective-product case. It is not so limited. The hazard applies to all product related injuries, including the sale of the wrong product or the wrongful sale of a product to a customer so long as the other requisites also are present.

*Cobbins,* 290 N.E.2d at 877. *See also Parma Seed, Inc. v. General Ins. Co.,* 94 Idaho 658, 496 P.2d 281, 286 (1972); *Pennsylvania Gen. Ins. Co. v. Kielon,* 112 A.D.2d 709, 492 N.Y.S.2d 502, 503–04 (N.Y.App. Div.1985); *Tiano v. Aetna Casualty and Surety Co.,* 102 Mich.App. 177, 301 N.W.2d 476, 480 (1980).

Finally, in response to Beretta's cross-motion for partial summary judgment, the defendants argue that they do not have a duty to defend Beretta because the Underlying Actions do not allege damages for "bodily injury" or "property damage" as defined by the Policies. *See* Defs.' Reply Supp.Mot. to Dis. at 20–22. If the products-hazard provision did not otherwise exclude coverage and the duty to defend, this argument would be rejected. The Policies provide that "Damages because of bodily injury include damages claimed by any person or organization for care, loss of services, or death resulting at any time from the bodily injury." *See e.g.,* Defs.' Mem.Supp.Mot. to Dis., Ex. .1 (1990–91 Policy, Coverage Section at 1). This is sufficient to cover the cities' claims for costs spent in providing medical care to victims of violence arising out of guns manufactured by Beretta and for the additional funds spent on emergency services.

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **OR-DERED that:**

1. the defendants' motion to dismiss or for summary judgment is **Granted;**

2. the plaintiff's cross-motion for partial summary judgment is **Denied;**

3. the Clerk shall **CLOSE** this case; and

4. copies of this Order and the accompanying Memorandum shall be mailed to counsel of record.